FILED

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| ROBERT BOSCH LLC, )<br>a Delaware Limited Liability Company, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>WILLIAM C. SCHMIDT and TRICO PRODUCTS )<br>CORPORATION, a New York Corporation, )<br>)<br>Defendants. )<br>_____) | Case No. 3:14CV415 |

**MEMORANDUM OF ROBERT BOSCH LLC IN SUPPORT OF MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Robert Bosch LLC ("Bosch") respectfully submits this Memorandum in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against William C. Schmidt ("Schmidt") and Trico Products Corporation ("Trico").

**I.    Preliminary Statement**

Defendant Schmidt resigned from Bosch to become the Director of National Accounts at Defendant Trico on January 27, 2014. (Verified Compl. ("Compl.") ¶ 1.) During the last several years of his employment at Bosch, Schmidt was responsible for just one account -- Carquest -- but he was responsible for sales of many products to Carquest, including windshield wipers, spark plugs, ignition parts, air and fuel filters, and much more. (*Id.* ¶ 23.) In his new position at Trico, he is responsible for a number of its national accounts, but just for one product -- windshield wipers -- which is the only product sold by Trico. (*Id.*, ¶¶ 1, 37.)

During the early morning hours on the day of his resignation from Bosch, Schmidt copied sixteen Bosch files from the Bosch server to his Maxtor One Touch III USB External Hard Drive ("External Hard Drive") while it was connected to his Bosch laptop. (*Id.* ¶ 2.) During that same

time of a little over an hour, Schmidt copied or accessed a number of additional Bosch files, some of which were copied that morning and others that were copied to his External Hard Drive in the days leading up to January 27, 2014. (*Id.* ¶¶ 2, 3, 28.) Those files had almost nothing to do with Carquest, his one Bosch account, but did contain critical pricing, contract, cost and sales data for many of his new accounts at Trico, including, Advance Auto Parts, Inc. ("Advance"), Aftermarket Auto Parts Alliance, Inc. and its members ("AAPA"), AutoZone, Inc. ("AutoZone"), NAPA Auto Parts ("NAPA"), SSF Imported Auto Parts, LLC ("SSF") and Wal-Mart Stores, Inc. ("Walmart"). (*Id.* ¶¶ 13, 34, 35.) Moreover, the files accessed by Schmidt related almost exclusively to wipers, the one product he would be responsible for selling at Trico. On the date of his resignation, Schmidt would have no legitimate reason to access any confidential information about Bosch's wiper business.

In total, Schmidt collected more than 60 Bosch files on his External Hard Drive between January 16, 2014 and January 27, 2014 (*Id.* ¶¶ 2, 3, 28), none of which should have been on his External Hard Drive. By January 16, 2014, when he created a folder on his External Hard Drive to collect Bosch's trade secret and confidential information, Schmidt had been in contact with Trico for some time about changing jobs. On January 17, 2014, he had a telephone conversation with a Trico representative. (*Id.* ¶ 28.)

In view of the forensic evidence, the timing of Schmidt's actions, the fact that the files would only be useful to him at Trico and not at Bosch, the nature of his new position at Trico, and the critical negotiations that soon followed and are now ongoing with a number of customers or potential customers for whom Bosch and Trico are competing, the risk of misuse of Bosch's trade secrets and confidential information under the compelling circumstances of this case is extremely high. In light of this imminent danger, Bosch requests the issuance of temporary,

preliminary and permanent injunctive relief (i) barring Schmidt from engaging in any wiper sales activity for a period of one year; (ii) alternatively, barring Schmidt from engaging in any wiper sales activity concerning certain specific customers that were the subject of the files that Schmidt improperly accessed,[1] (iii) barring Defendants from using, disclosing, or disseminating Bosch's confidential and trade secret information, and (iv) requiring Defendants to return to Bosch all of Bosch's confidential and trade secret information.

## II. Factual Background

### A. The Automotive Aftermarket Business

The automotive aftermarket parts industry in the United States is highly competitive. (*Id.* ¶ 11.) Factors affecting competition include product quality and features, innovation and development time, and pricing. (*Id.*) Trico is a primary competitor of Bosch in the windshield wiper category. (*Id.* ¶ 1.) Both companies manufacture, market and sell windshield wipers through major channels of distribution. (*Id.* ¶¶ 4, 5, 7, 13.) Bosch sells wiper blades to national automotive aftermarket wholesalers, including Carquest Auto Parts ("Carquest"), Advance, NAPA, AAPA and SSF, as well as businesses that sell primarily at retail such as AutoZone, Walmart and O'Reilly Automotive, Inc. ("O'Reilly"). (*Id.* ¶ 13.)

### B. Bosch's Confidential and Trade Secret Information and the Reasonable Measures Taken by Bosch to Limit its Access and Use

Bosch's invests substantial time, money and skill in developing and refining its product

---

[1] Specifically, Bosch requests injunctive relief with respect to the following customers or potential customers of Trico: Advance, AutoZone, NAPA, SSF, Walmart and each of their subsidiaries, as well as independent purchasing groups AAPA, AIM Automotive Group (AIM), Automotive Distribution Network (ADN), including CMB and IWD, Automotive Parts Associates, Inc. (APA), Federated Auto Parts Distribution (Federated), National Pronto Association (Pronto), TruStar, Inc. (TruStar) and each of their members or affiliates.

portfolio for the automotive aftermarket, and its marketing and selling expertise, distribution capabilities and customer relationships have enabled it to succeed in a highly competitive industry. (*Id.* ¶¶ 11-13.) Bosch's continued success in the $600 million windshield wiper aftermarket depends on the products, services and customer partnerships that it has developed. (*Id.* ¶¶ 1, 5, 13.)

The information at issue in this case, including customer-specific pricing data, sales data, rebate and promotional information, cost data, customer and agency agreements, inventory information, new product releases, market research and point of sale reports are trade secrets of the highest order. (*Id.* ¶¶ 3, 14-19.) In order to protect the secrecy of its trade secrets and other confidential information, Bosch requires employees to execute confidentiality agreements and restricts employee access to physically and electronically stored documents containing confidential and trade secret information based on an employee's need to know such information in carrying out his or her duties. (*Id.* ¶¶ 20-22.)

As a condition of and throughout his employment with Bosch, Schmidt executed Confidentiality Agreements in which he agreed not to disclose or use Bosch's confidential and trade secret information. (*Id.* ¶ 24.) Schmidt also agreed to comply with the terms of Bosch's Computer Usage Policy, which prohibits access to confidential, strictly confidential and proprietary information that an employee does not need for his work and the use of computer hardware, such as USB devices, unless authorized. (*Id.* ¶ 25.)

C. **Defendants' Actual and Threatened Misappropriation of Confidential and Trade Secret Information**

During the last months of his employment with Bosch, Trico actively recruited Schmidt to leave Bosch to become a Director of National Accounts at Trico. (*Id.* ¶ 27.) After he accepted employment with Trico, Schmidt misappropriated Bosch's confidential and trade secret customer

information for use in his new position. (*Id.* ¶¶ 2, 28-29.) On January 16, 2014, he created a folder designated as "New folder (6)" on his External Hard Drive. (*Id.* ¶¶ 3, 32; Exhibit A, Declaration of Brandon Fannon ("Fannon Decl."), ¶ 6.c.) Forensic evidence taken from Schmidt's Bosch laptop indicates that sometime after 6:26 p.m. on January 16, 2014 he moved 60 files into "New folder (6)." (Compl. ¶ 28; Fannon Decl. ¶¶ 6.b - 6.e, 11.g - 11.h.) On January 27, 2014, eleven days after creating the folder on his External Hard Drive and on the very morning of his resignation from Bosch, forensic evidence indicates that between 5:16 a.m. and 6:35 a.m., Schmidt accessed nearly thirty Bosch files. (Compl. ¶¶ 2, 29; Fannon Decl., ¶¶ 6.b - 6.e, 11.h.) At least sixteen of the files accessed on his External Hard Drive were accessed immediately before (usually less than a minute) they were accessed from the Bosch server. Thus, while connected remotely to the Bosch servers, these sixteen files were copied from the Bosch servers to Schmidt's External Hard Drive. At about 9:20 a.m., Schmidt called his supervisor to advise him of his resignation, and later that morning sent a letter of resignation by e-mail. (Compl. ¶ 29.) On January 28, 2014, from 7:17 a.m. to 7:25 a.m., over 1,730 documents were deleted from Schmidt's Bosch laptop. (Fannon Decl., ¶ 6.f; Compl. ¶ 33.)

When asked to return his Bosch equipment, information and data, Schmidt did not initially return his USB devices. On January 30, 2014, he met with a Bosch employee to return his laptop and other equipment and information but he did not return the External Hard Drive at that time or advise the Bosch representative that he used the External Hard Drive just three days before to collect almost thirty files containing confidential Bosch documents and information. (Compl. ¶ 30.) It was only after receiving a letter from Bosch's in-house counsel dated February 5, 2014 (and presumably received by Schmidt on February 6, 2014) reminding him of his confidentiality obligations and advising him of Bosch's concerns about a possible

5

misappropriation that Schmidt sent his External Hard Drive and three portable USB thumb drives back to Bosch on February 8, 2014. The USB devices were sent in a package with no prior notice and no indication as to what he was returning or why he was returning it at that time. When Bosch learned that he had returned USB devices on May 23, 2014, it was promptly analyzed and that analysis confirmed, among other things, that Schmidt was copying Bosch files from the server to his External Hard Drive just hours before tendering his resignation. (*Id.* ¶ 32.)[2]

Schmidt was not authorized to access the information contained on the files in the "New folder (6)" which had nothing to do with the Carquest account for which he was responsible. Nor was Schmidt authorized to copy any Bosch files to USB devices. (Compl. ¶¶ 20-22, 25.) The files appear to have been carefully selected to give Schmidt exactly what he would need to jumpstart his performance in a new job at Trico. (*Id.* ¶¶ 3-4, 34, 36-38.) For example, the following information and files were among those accessed by Schmidt in January 2014:

(a) confidential customer information relating to multiple key accounts for which Schmidt had no responsibility at Bosch, including pricing, rebates, promotions, commissions, purchasing histories, product returns, product mix, point of sale reports, proposals, market analysis, and forecasts. *See e.g.*, NAPA 2013 Expense Detail Log.xlsx; 2013 Wiper Blade Volume Program-Proposal3.xlsx; 2013 Volume Blade Wd Master Customer Summary.xlsx; 2014 Zone 206 Off Inv Summary.xlsx; Alliance Pricing 9-2-13.xlsx; Napa and Altrom 2013 Purchase Analysis-July.xlsx; Wiper Promotional Calendar.xlsx;

(b) confidential customer information unrelated to the Carquest account, including profitability analyses revealing actual and/or projected net sales, gross margins, cost of goods sold, SG&A expenses, operating income, payment terms, cost of capital, competitor lift funding, rebates, promotion, and other incentives. *See e.g.*, Walmart Proj Calc Proposals 12 17 12-5 w sugg retails.xlsx;

---

[2] The forensic examination of Schmidt's USB devices shows that he did not use such devices in the ordinary course of his employment with Bosch. (*Id.* ¶ 32.) Schmidt had not used the External Hard Drive to save or create files since August 2, 2012 except to copy the Bosch files onto his External Hard Drive in January 2014. (*Id.*)

    (c)    confidential customer and potential customer presentations. *See e.g.*, AAPA WD Level Full Pitch 10_23_13.pdf; Bosch WB Partnership with Home Depot - 071113.pptx; 1.19.13 Wiper Line Review Bosch.pptx;

    (d)    confidential agreements in effect between Bosch and a few of its customers. *See e.g.*, ADN CMB and IWD combined 2013 Agreement.pdf; SSF2013AgreementSigned013.pdf; Wiper Blade Signed Agreement Sept 1 2011 needing Walls signature.pdf; and

    (e)    confidential agreement between Bosch the agency that represents Bosch before a customer. *See* NA Williams Commission Sales Rep Agreement 2013.pdf.

(*Id.* ¶ 34; Fannon Decl. ¶¶ 6.b, 6.d.)

The facts relating to Schmidt's misappropriation are so incriminating that they leave no doubt that he intends to use that information against Bosch in his new position at Trico. There is no conceivable justification for copying and accessing these files at any time, much less on the day of his resignation. The inference that he has used Bosch's trade secrets in the months following his resignation from Bosch is inescapable. With the benefit of discovery, Trico's role in the facts relating to Schmidt's misappropriation while at Bosch may become clearer, but Schmidt's conduct alone, including his near certain use of the trade secrets while acting in the scope of his employment at Trico, makes Trico liable for misappropriation. Bosch has shown a clear and imminent threat that its trade secrets will be used unless restrained by this Court.

### III. Argument

The standard for issuing a temporary restraining order is the same as that for issuing a preliminary injunction. *Audio-Video Grp., LLC v. Green*, No. 1:14-cv-169 JCC/TCB, 2014 WL 793535, at *2 (E.D. Va. Feb. 26, 2014) (citing *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 526 (E.D. Va. 2006)). When determining whether such relief is appropriate, a court must consider: (1) the probability that the plaintiff will suffer irreparable harm if injunctive relief is not awarded; (2) the likelihood of harm to the defendant(s) in the event that injunctive relief is awarded; (3) the plaintiff's likelihood of success on the merits; and (4) whether the public

interest is served by an award of injunctive relief. *Id.; Ancora Capital & Mgmt. Grp., LLC v. Gray*, 55 Fed. App'x. 111, 113 (4th Cir. 2003). Of these considerations, "[t]he two most important factors are probability of irreparable injury to the plaintiff without a decree and likelihood of harm to the defendant with a decree." *Id.*

### A. BOSCH IS LIKELY TO SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS DENIED

Under the Virginia Uniform Trade Secrets Act ("VUTSA"), "[a]ctual or threatened misappropriation may be enjoined." Va. Code § 59.1-337. "The disclosure of trade secrets establishes immediate irreparable harm because 'a trade secret, once lost is, of course, lost forever.'" *Home Funding Grp., LLC v. Myers*, No. 1:06-cv-1400 (JCC), 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006). The same is true with respect to the disclosure of confidential information. *Id.*

Bosch has demonstrated an imminent and likely threat of irreparable harm if Defendants are not enjoined from further accessing and using Bosch's confidential and trade secret information. As set forth above, Schmidt has already accessed, without authorization, files that provide Bosch's marketing "playbook" containing critical and highly sensitive customer information that Bosch goes to great lengths to protect. The misappropriation at issue occurred under circumstances that leave no doubt about Schmidt's intent. Armed with this information, Schmidt now manages several of the national accounts for Trico, a direct competitor of Bosch. Schmidt and his new employer will have the benefit of that information to solicit business away from Bosch. If Defendants are not enjoined from any further disclosure and use of Bosch's trade secret information, Bosch will continue to lose business and customer goodwill to an extent that is impossible to rectify with mere money damages after the fact. (*Id.* ¶¶ 4, 47.) Thus, Bosch faces irreparable harm if temporary and preliminary injunctive relief is not awarded. *See Title*

8

*Trading Servs. USA, Inc. v. Kundu*, No. 3:14-cv-225-RJC-DCK, 2014 WL 1765128, at *3 (W.D.N.C. May 2, 2014) (finding plaintiff established clear showing of irreparable harm warranting award of temporary injunctive relief where full extent of injuries associated with further dissemination and use of plaintiff's trade secret was difficult to ascertain); *see also Ciena Corp. v. Jarrard*, 203 F.3d 312, 323 (4th Cir. 2000) (affirming district court's issuance of interlocutory injunctive relief finding that former employer would suffer irreparable harm where employee in key position at former employer had moved to key position with direct competitor).

### B.  ANY HARM TO DEFENDANTS IF INJUNCTIVE RELIEF IS GRANTED IS MINIMAL

In contrast to the irreparable harm that will result to Bosch absent an award of injunctive relief, the Defendants face little or no harm if injunctive relief is awarded, tipping the balance strongly in favor of an award of injunctive relief. If injunctive relief is awarded, such relief merely places Trico in the position of continuing its operations in the same manner as it had prior to Schmidt's arrival. *See Home Funding Grp., LLC*, No. 1:06-cv-1400 (JCC), 2006 WL 6847953, at *2 (finding no harm would result to former employee or new employer if injunction issued because new employer would continue its business as it had previously and injunction would only prohibit the defendants from engaging in any continued illegal activity).

Similarly, an award of injunctive relief poses little risk of harm to Schmidt. As with Trico, no harm inures to Schmidt from restricting his use of Bosch's confidential information and trade secrets, information that he was not authorized to access or copy to a USB device and which Schmidt was contractually obligated to keep confidential. *Title Trading Servs. USA, Inc.*, No. 3:14-cv-225-RJC-DCK, 2014 WL 1765128, at *4 (finding harm to former employee and his new employer enjoining use of plaintiff's trade secrets to be minimal as injunction would not threaten any legitimate business interests of defendant); *Fidelity Global Brokerage Grp., Inc. v.*

*Gray*, No. 1:10-cv-1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (finding no potential harm would result to former employee and his new employer from injunction prohibiting use of plaintiff's customer information if former employee was prohibited from using customer information he gained while employed by plaintiff). To the extent that Schmidt is harmed by an injunction, it is harm of his own making.

An injunction barring Schmidt from engaging in wiper sales activity for a reasonable cooling-off period of one year, or activity relating to the actual or potential customers of Trico that were the subject of the files that Schmidt improperly accessed, is narrowly tailored and only prevents Schmidt from engaging in business activities that threaten to implicate Bosch's trade secret customer information. *See Ancora Capital & Mgmt. Grp., LLC*, 55 Fed. App'x. at 114 (finding district court erred in failing to award injunctive relief against plaintiff's former employee where former employee might have ability to find other employment outside his area of experience and could be compensated for lost wages in any event); *Ciena Corp.*, 203 F.3d at 323 (affirming district court's issuance of injunctive relief finding potential harm to former employee was limited in that former employee's education and background qualified her to get meaningful work in other areas and diminished the harm to her). Indeed, by stealing information about the customers he would be responsible for at Trico, Schmidt has effectively crafted the injunction relief that should be entered.

C. **BOSCH HAS ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS**

While Bosch is likely to succeed on the merits of all its causes of action, Bosch's motion and memorandum focus primarily on Bosch's claim for misappropriation of trade secrets and breach of contract. Bosch's confidential and trade secret allegations lie at the heart of Bosch's claim under all of the theories alleged. *Audio-Video Grp.*. 2014 WL 793535, at *2 (plaintiff need only establish a likelihood of success on the merits as to one of its claims to justify injunctive

relief).[3]

1. <u>Bosch Is Likely To Succeed On Its VUTSA Claim Against Defendants.</u>

Pursuant to the Virginia Uniform Trade Secrets Act ("VUTSA"), a court may grant injunctive relief to prevent actual or threatened misappropriation. Va. Code § 59.1-337. In order to establish a claim under VUTSA, a plaintiff must show the existence of a trade secret and an actual or threatened misappropriation. *Physicians Interactive v. Lathian Sys., Inc.*, No. CA 03-1193-A, 2003 WL 23018270, at *8 (E.D. Va. Dec. 5, 2003). Bosch is likely to succeed in proving both elements.

(a) The Files Accessed Contain Trade Secrets

Under VUTSA, a trade secret is "information that derives economic value from its secrecy and is subject to reasonable attempts to be maintained as a secret." *Physicians Interactive*, No. CA 03-1193-A, 2003 WL 23018270, at *8; *see also* Va. Code §59.1-336. The information accessed by Schmidt prior to his resignation included Bosch's pricing, costs of goods, costs of sales, inventories, profitability parameters, and future advertising and promotional plans with respect to multiple key customers in the aftermarket for wiper blades, the secrecy of which Bosch employs substantial efforts to protect. (Compl. ¶¶ 3-4, 14-22.) The information Schmidt accessed reveals Bosch's current and intended competitive plans, which is

---

[3] Bosch is likely to succeed on the merits of its Computer Fraud and Abuse Act ("CFAA") claim against Schmidt. The allegations of Complaint amply demonstrate that Schmidt accessed confidential Bosch documents "without authorization" or "exceed[ed] authorized access" on a computer used in interstate communication. *See* 18 U.S.C. § 1030 (a)(2)(C) (the CFAA is violated by whoever "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."). Likewise, Bosch will also establish that Schmidt, Bosch's Senior Key Account Manager, had a duty of loyalty to Bosch that was breached when he acquired, retained and subsequently used Bosch's confidential and trade secret information for his own personal benefit. *See, e.g., Audio-Video Group, LLC*, 2014 WL 793535, at *3-5 (finding plaintiff established likelihood of success for purposes of preliminary injunctive relief based on allegations plaintiff's former employee was competing with plaintiff prior to his termination).

precisely the type of information courts consider protectable as trade secrets under VUTSA. *See Audio-Video Grp.*, 2014 WL 793535, at *4 (finding plaintiff had alleged protectable trade secrets where information at issue included pricing methods and models, specifications, marketing plans and cost structures); *Physicians Interactive*, No. CA 03-1193-A, 2003 WL 23018270, at *8 (finding customer information is a classic example of a trade secret). Over the course of 80 years in the aftermarket wiper blade business, Bosch has pioneered some of the most advanced technologies in the wiper blade business, developed pricing models that enable it to make competitive bids, and compiled information unique to customers and potential customers. (Compl. ¶¶ 12-15.) The information accessed by Schmidt on the day he resigned would give him and Trico a critical and unfair advantage over Bosch in wiper negotiations involving tens of millions of dollars.

Further, Bosch has taken reasonable steps to ensure the secrecy of its trade secret information by limiting access to such information based on an employee's need-to-know, storing information on password protected databases, implementing policies and procedures to maintain building, plant and computer security and requiring its employees to sign confidentiality agreements. *See Marstellar v. ECS Federal, Inc.*, No. 1:13-cv-593 (JCC/JFA), 2013 WL 4781786, *4 (E.D. Va. Sept. 5, 2012) (finding storage of trade secrets on an internal, password protected server to be reasonable steps to maintain secrecy of a trade secret); *MicroStrategy*, 331 F. Supp. 2d at 416 ("[r]estricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts.")

    (b)    Defendants Have Misappropriated Bosch's Trade Secrets.

Under VUTSA, "misappropriation" occurs if a persons knows or has reason to know that a trade secret was acquired, disclosed or used by "improper means," such as "theft, bribery, misrepresentation, use of a computer or computer network without authority, breach of a duty or

inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Va. Code § 59.1-336.

Bosch will establish that its trade secret information was misappropriated by both Schmidt and Trico. Schmidt accessed the trade secret documents without authorization, secretly copied the files to his unauthorized External Hard Drive, accessed them on the date of his resignation, and used that information in his employment with Trico. These acts constitute theft, use of a computer without authority, and breach of his fiduciary and contractual duties to Bosch. *See Audio-Video Grp.*, 2014 WL 793535, at *4 (finding plaintiff established likelihood of success for purposes of preliminary injunctive relief based on allegations that plaintiff's former employee was bound by confidentiality agreement and nevertheless used plaintiff's confidential information in attempting to obtain at least one customer account); *Marsteller*, No. 1:13-cv-593 (JCC/JFA), 2013 WL 4781786, *4 (finding "allegations of unauthorized transfer of trade secret documents to a storage device are sufficient to state a plausible claim that [defendant] acquired the information by 'improper means'").

Under Virginia law, an individual and his employer may both be liable even if the employer has no knowledge of the employee's misappropriation. *Newport News Indus. v. Dynamic Testing, Inc.*, 130 F. Supp. 2d 745, 750 (E.D. Va. 2001) (finding plaintiffs stated a claim for respondeat superior liability under VUTSA based on former employee's disclosure and use of plaintiffs' trade secret information for the benefit of his new employer). An employer is liable for the tortious acts of its employees if that employee was acting within the scope of the employment when the tortious acts are committed. *Id.* Generally, an act is within the scope of employment if it was directed by the employer or naturally incident to the business (or foreseeable from his duties) and performed to further the employer's interest. *Id.*

To the extent that the interests of Trico are implicated by the injunctive relief sought by Bosch, the evidence is sufficient to establish a likelihood of success on Bosch's VUTSA claim against Trico based on the doctrine of respondeat superior. *See Physicians Interactive*, No. CA 03-1193-A, 2003 WL 23018270, at *8 (finding plaintiff established likelihood of success on VUTSA claim against defendant employer based on the doctrine of respondeat superior).

2. <u>Bosch Is Likely To Succeed On Its Contract Claim Against Schmidt.</u>

In addition to violating statutory prohibitions in the VUTSA, Schmidt also violated his contractual obligations to Bosch by wrongfully accessing and then using Bosch's confidential and trade secret information. Under Virginia law, restrictive covenants ancillary to the employment relationship such as a confidentiality agreement are enforceable. *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 828 (E.D. Va. 2011).

In the Confidentiality Agreements, Schmidt agreed: (1) only to use Bosch's Confidential Information on a need-to-know basis for the purpose of benefiting Bosch; (2) not to use Bosch's Confidential Information for himself or for third parties during or after his employment with Bosch; and (3) upon leaving Bosch, not to make or retain any copies of any Confidential Information and not to use Confidential Information for himself or third parties. (Compl., ¶ 24.) Bosch's Computer Usage Policy, which Schmidt also agreed to abide by, limited access rights to information needed by an employee for his work. (*Id.*) Notwithstanding the terms of the Confidentiality Agreements and Bosch's Computer Usage Policy, Schmidt copied confidential customer files shortly before he resigned, and he and his employer, Trico, have used or will use the information contained in those files for purposes of gaining a competitive advantage over Bosch to solicit business from these customers. Bosch is likely to prevail on its breach of contract claim as well as the statutory claims.

## D. INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

"Public interest favors the protection of confidential information and the enforcement of valid contracts." *Fidelity*, No. 1:10-cv-1255, 2010 WL 4646039 at * 4. In addition, in cases where a complaint alleges misappropriation of trade secrets, issuance of preliminary injunctive relief serves the purpose of "preventing actual or imminent misuse of secret information gained by reason of a confidential business relationship." *Catalog Mktg. Servs., Ltd. v. Savitch*, No. 88-3538, 1989 WL 42488, at *4 (4th Cir. Apr. 24, 1989). The issuance of injunctive relief in this case serves to prohibit any further use or dissemination of Bosch's secret customer information and thus serves the public's well-established interest in protecting such information. *Title Trading Servs. USA*, No. 3:14-cv-255-RJC-DCK, 2014 WL 1765128, at *4 (finding public has a clear interest in protecting trade secrets).

## IV. Conclusion

For the foregoing reasons, and based on the matters set forth in the Verified Complaint for Injunctive and Other Relief, Bosch respectfully requests that the Court grant its motion for a temporary restraining order and preliminary injunction.

Dated: June 5, 2014.

Respectfully submitted,

ROBERT BOSCH LLC,

By: _____
One of its attorneys

Kimberly A. Taylor VSB #29823
KEPLEY, BROSCIOUS & BIGGS, PLC
2221 Pump Road
Richmond, VA 23233
Telephone: (804) 741-0400
Facsimile: (804) 741-6175
ktaylor@kbbplc.com

15

Stephen J. O'Neil
Amy S. Dolgin
K&L GATES LLP
70 W. Madison Street, Ste. 3100
Chicago, Illinois 60602
Telephone:   (312) 372-1121
Facsimile:    (312) 827-8000
stephen.oneil@klgates.com
amy.dolgin@klgates.com

Douglas W. Britt
K&L GATES LLP
4350 Lassiter at North Hills Avenue, Suite 300
Raleigh, NC 27609
Telephone:   (919) 743-7300
Facsimile:    (919) 743-7358
douglas.britt@klgates.com